

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

BMO CAPITAL MARKETS CORP. f/k/a
HARRIS NESBITT CORP.,

              Plaintiff,

       v.

McKINLEY MEDICAL LLC

              Defendant.

)
)
)
)
)
)
)
)
)
)
)
)

06CV6071
JUDGE DER-YEGHIAYAN
MAG. JUDGE SCHENKIER

No.

**FILED**

NOV - 7 2006
NOV - 7, 2006
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

## COMPLAINT

NOW COMES the Plaintiff, BMO CAPITAL MARKETS CORP. F/K/A HARRIS NESBITT CORP., by and through its attorneys, and for its Complaint against defendant McKINLEY MEDICAL LLC, states as follows:

### THE PARTIES

1.    Plaintiff BMO Capital Markets Corp. f/k/a Harris Nesbitt Corp. (*"BMO"*) is a Delaware corporation with a place of business in Chicago, Illinois.

2.    Defendant McKinley Medical LLC (*"McKinley"*) is a Colorado limited liability company with a principal place of business in Wheat Ridge, Colorado.

### JURISDICTION

3.    Jurisdiction is proper pursuant to 28 U.S.C. §1332 because the parties are citizens of different states and the matter in controversy exceeds the sum of $75,000.

### VENUE

4.    Venue is proper in this district because the contract which forms the basis of this complaint expressly states "[a]ll actions and proceedings arising out of or relating to this letter agreement shall be heard and determined exclusively in any Illinois state or federal court sitting

2131937 01 06 doc

in the City of Chicago, to whose jurisdiction [McKinley] hereby irrevocably submits." Further, venue is proper in this district pursuant to §1391(a), in that the contract which forms the basis of this complaint originated in this district, and a substantial part of the events giving rise to this complaint occurred in this district.

## FACTS

5.     BMO is a financial services provider and, until June 2006, was known as Harris Nesbitt Corp.

6.     McKinley was, and is, a provider of ambulatory drug delivery systems, whose main products were, prior to the Merger (as hereinafter defined), Accufuser, BeeLine, OutBound and WalkMed.

7.     On or about August 26, 2005 McKinley engaged BMO as "exclusive financial advisor" to McKinley and its affiliate companies in connection with a possible sale or merger of all, or a part of, McKinley's stock or assets. This engagement was memorialized by a seven-page engagement letter (the "*Engagement Letter*"), a true and correct copy of which is attached hereto as Exhibit A.

8.     The Engagement Letter is unambiguous, and spells out in specific detail the arrangement between the parties.

9.     The Engagement Letter states that McKinley engaged BMO to act as financial advisor in connection with one of a number of transactions, expressly defined as: "a possible sale of all or a substantial portion of the stock or assets of [McKinley], a joint venture with and/or a merger, consolidation, recapitalization, exchange or other business combination involving [McKinley] or one or more of its affiliates (collectively, a 'Possible Transaction')." *See* Ex. A, p. 1 (parentheses in original).

10. As payment for its work in connection with a Possible Transaction, McKinley

agreed to compensate BMO as follows, as expressly detailed in the engagement letter:

4. **Fees and Expenses.** For our services hereunder, [McKinley] will pay to [BMO] the following fees:

a. **Base Fee.** An initial engagement fee of $25,000 (the "Base Fee"), payable promptly upon the execution of the letter agreement by [McKinley]. The Base Fee shall be credited against the Success Fee.

b. **Success Fee.** A success fee (the "Success Fee"), payable in respect of any Possibly Transaction that is consummated and payable on the closing thereof. The Success Fee shall be equal to the following schedule:

   i. 2.0% of the Aggregate Value (as hereinafter defined) up to $35,000,000; plus

   ii. 2.5% of the incremental Aggregate Vale between $35,000,000 and $40,000,000; plus

   iii. 3.0% of the incremental Aggregate Value greater than $40,000,000;

provided that, in no event shall the Success Fee be less than $700,000, except in the case that the Possible Transaction involves one of the parties known to us and to you as Smiths Medical, DJ Orthopedics or Moog, Inc.; then such Success Fee shall not be less than $650,000.

*See* Ex. A, ¶ 4 (underscore added).

11. The inclusion of Moog, Inc. ("*Moog*") into the Engagement Letter's fee provision

was an essential part of the deal between BMO and McKinley, as McKinley had had sale or

merger discussions with Moog prior to McKinley's engagement of BMO.

12. Both parties to the Engagement Letter understood that BMO's work could be a

benefit to McKinley whether or not a Possible Transaction was closed with a new or previously

identified buyer.

13. After its retention, and over the next 12 months, BMO performed substantial work

for McKinley per the terms of the Engagement Letter. For example, BMO developed a

Confidential Information Memorandum and contacted over 70 potential buyers. BMO

employees then followed up with the potential buyers, and had personal discussions and

correspondence with a number of them regarding a Possible Transaction. Throughout this

process, BMO employees were in close and continuing contact with McKinley management, sometimes speaking with McKinley on a semi-weekly basis regarding BMO's work.

14.     BMO's marketing process covered a wide range of both U.S. and foreign strategic buyers in the medical device industry, as well as financial buyers with industry knowledge.

15.     On or about August 24, 2006, approximately one year after McKinley engaged BMO, McKinley closed a merger (the "*Merger*") of one of McKinley's affiliated companies into Moog. A copy of Moog's Securities and Exchange Commission Form 8-K filing regarding the Merger, as well as the Moog press release attached thereto, are attached hereto as group Exhibit B.

16.     Moog described the transaction as follows:

> Moog, Inc. announced today that it closed on a merger of McKinley Medical Corporation based in Denver, Colorado into Moog on August 24, 2006. McKinley Medical Corporation was a wholly owned subsidiary of McKinley Medical, LLC . . . . McKinley Medical Corporation designs, assembles and distributes disposable pumps and accessories used principally to administer therapeutic drugs for chemotherapy and antibiotic applications . . . marketed under the brand names Accufuser and Beeline. Moog paid $15 million in the form of 445,725 shares of Moog Class A common stock in exchange for the shares of McKinley Medical Corporation.

*See* group Ex. B, p. 5.

17.     McKinley Medical Corporation was formed to facilitate the Merger with Moog, and was at all times an affiliate company of defendant McKinley.

18.     Upon its engagement of BMO, McKinley paid BMO the $25,000 Base Fee set forth in the Engagement Letter.

19.     The Merger was a transaction specifically contemplated by the Engagement Letter, as it was a "sale of all or a substantial portion of the stock or assets of [McKinley], a joint

venture with and/or a merger, consolidation, recapitalization, exchange or other business combination involving |McKinley| or one of more of its affiliates."

20.     Specifically, the Merger was a merger between McKinley's affiliated company, McKinley Medical Corporation (which contained the principal product lines Accufuser and BeeLine), and Moog, Inc.

21.     Upon closing of the Merger, McKinely owed BMO a remaining $625,000 Success Fee as expressly detailed in the Engagement Letter: "in no event shall the Success Fee be less than $700,000, <u>except in the case that the Possible Transaction involves one of the parties known to us and to you as . . . Moog, Inc.; then such Success Fee shall not be less than $650,000.</u>" *See* Ex. A, ¶4 (underscore added).

22.     By letter dated August 28, 2006, after closing of the Merger, BMO made a demand upon McKinley for payment of the remaining $625,000 Success Fee.

23.     McKinley has failed to pay the $625,000 Success Fee that it expressly agreed to pay under the terms of the Engagement Letter.

24.     BMO has performed all of its duties and obligations under the terms of the Engagement Letter.

**WHEREFORE**, Plaintiff BMO Capital Markets Corp. respectfully requests the following relief:

(A)     This Court enter judgment in favor of Plaintiff BMO Capital Markets Corp. and against Defendant McKinley Medical LLC in the total amount of $625,000, including pre-judgment interest and post-judgment interest; and

(B)     Any other and further relief this Court deems to be just and proper.

BMO Capital Markets Corp.

By /s/ _____
One of Its Attorneys

Richard A. Wohlleber
Joseph P. Lombardo
Chapman and Cutler LLP
111 West Monroe Street
Chicago, Illinois  60603
(312) 845-3000

**EXHIBIT A**



**HARRIS NESBITT**

Harris Nesbitt Corp.
111 West Monroe Street
Chicago, IL 60603
www.harrisnesbitt.com

August 26, 2005

**CONFIDENTIAL**

Mr. David Maytubby
Chief Financial Officer
McKinley Medical LLC
252 Clayton Street
Denver, CO 80206

Dear Mr. Maytubby:

We understand that McKinley Medical LLC ("the Company") or one or more of your affiliates is evaluating a possible sale of all or a substantial portion of the stock or assets of the Company, a joint venture with and/or a merger, consolidation, recapitalization, exchange or other business combination involving the Company or one or more of its affiliates (collectively, a "Possible Transaction"). The purpose of this letter is to confirm the appointment of Harris Nesbitt Corp. (Harris Nesbitt", "we" or "us") to act as exclusive financial advisor to the Company and its affiliates in connection with any Possible Transaction.

1.  **Services to be rendered by Harris Nesbitt.** Harris Nesbitt will provide the following services to the Company, as may be appropriate and requested by you, in connection with a Possible Transaction:

    a.  Harris Nesbitt will familiarize itself, to the extent we deem appropriate and feasible, with the business, operations, properties, condition (financial and otherwise) and prospects of the Company;

    b.  we will assist the Company in developing a general strategy for accomplishing a Possible Transaction;

    c.  we will advise the Company on the appropriate structuring of a Possible Transaction, taking into account the Company's objectives disclosed to us;

    d.  we will provide financial and general advice as to the consideration offered in the Possible Transaction;

    e.  we will assist the Company in the preparation of an information memorandum (an "Information Memorandum) for distribution to potential purchasers (if requested);

    f.  we will assist the Company in developing a list of potential participants in a Possible Transaction (if requested);

    g.  we will contact such potential participants, as agreed to by the Company, and conduct discussions and negotiations with such parties;

8884770.1 41601 1408C 01717789

A member of BMO  Financial Group



h.  we will assist the management of the Company in making presentations to potential participants concerning the Possible Transaction;

i.  we will assist in negotiating the financial terms of the Possible Transaction; and

j.  we will provide such other services as the Company and Harris Nesbitt agree are appropriate in the circumstances.

Notwithstanding anything herein to the contrary, it is understood that we are not undertaking to provide any legal, accounting or tax advice in connection with the engagement hereunder, and the Company shall rely solely upon its own legal, accounting and tax advisors and experts for advice of such nature.

2.  **Additional Services.** The engagement of Harris Nesbitt to perform any services in addition to those described herein shall be set forth in, and subject to the terms and conditions of, a separate letter agreement, and the compensation for such services will be negotiated separately in good faith and will be consistent with compensation paid to nationally-recognized investment banking firms for similar services. Without limiting the generality of the foregoing, the services provided hereunder shall not include appearance as a witness, the provision of evidence, orally, by deposition or by affidavit, or participation by Harris Nesbitt in connection with any court or administrative proceeding relating to any Possible Transaction except on the terms and conditions set forth in the indemnity agreement attached as Schedule A hereto (the "Indemnity").

3.  **Nature of Our Advice and this Engagement.** The Company acknowledges that all written or oral opinions, advice and materials provided by Harris Nesbitt to the Company in connection with Harris Nesbitt's engagement hereunder are intended solely for the benefit and internal use of the board of directors of the Company in considering the Possible Transaction, and the Company agrees that except for such internal company purposes no such opinion, advice or materials shall be used for any other purpose or reproduced, disseminated, quoted from or referred to at any time, in any manner or for any purpose, nor shall any public reference to Harris Nesbitt be made by the Company without our prior written consent in each specific instance.

Harris Nesbitt expressly disclaims any liability or responsibility to the Company or any affiliate thereof, their respective management and boards of directors or any other person or entity (including, without limitation, any past, present or future holder of securities of the Company) by reason of unauthorized use, publication, distribution or reference to any oral or written opinions or advice or materials provided by us or any unauthorized reference to Harris Nesbitt or this engagement.

In furtherance of the foregoing, the Company recognizes that Harris Nesbitt has been retained to advise the Company only, that Harris Nesbitt's services hereunder shall constitute services of an independent contractor, and that the Company's engagement of Harris Nesbitt is not deemed to be on behalf of, and is not intended to confer rights upon any shareholder, securityholder, owner, partner, officer, director, employee or creditor of the Company or any person not a party hereto as against Harris Nesbitt or any Indemnified Person as defined in the Indemnity. Subject to applicable law, unless otherwise expressly agreed by Harris Nesbitt in writing, no one other than the Company is authorized to rely upon this engagement of Harris Nesbitt or any statements or conduct of Harris Nesbitt. The parties acknowledge that Harris Nesbitt's role hereunder is advisory only and does not constitute a fiduciary relationship between Harris Nesbitt and the Company or with any other person.

4.  **Fees and Expenses.** For our services hereunder, the Company will pay to Harris Nesbitt the following fees:

A member of BMO ⊕ Financial Group



a.   **Base Fee.** An initial engagement fee of $25,000 (the "Base Fee"), payable promptly upon the execution of the letter agreement by the Company. The Base Fee shall be credited against the Success Fee.

b.   **Success Fee.** A success fee (the "Success Fee"), payable in respect of any Possible Transaction that is consummated and payable on the closing thereof. The Success Fee shall be equal to the following schedule:

    i.   2.0 % of the Aggregate Value (as hereinafter defined) up to $35,000,000; plus

    ii.   2.5% of the incremental Aggregate Value between $35,000,000 and $40,000,000; plus

    iii.   3.0% of the incremental Aggregate Value greater than $40,000,000;

provided, that, in no event shall the Success Fee be less than $700,000, except in the case that the Possible Transaction involves one of the parties known to us and to you as Smiths Medical, DJ Orthopedics or Moog, Inc.; then such Success Fee shall not be less than $650,000.

        The "Aggregate Value" of any Possible Transaction shall be the total value of the consideration paid or payable to the Company, or any of its affiliates or securityholders (including holders of warrants, options and other securities) in connection with a Possible Transaction.Such onsideration shall include (i) the value of any debt, capital lease or similar non-trade liabilities or obligations of the Company assumed, retired, or defeased in connection with the Possible Transaction and (ii) amounts paid pursuant to covenants not to compete, employment contracts or similar arrangements. The value of the consideration paid shall also include the aggregate amount of any dividends or other distributions (in cash or otherwise) which are declared by the Company to its securityholders on its equity shares on or after the date hereof other than normal recurring cash dividends in amounts not materially greater than currently paid. If any portion of the Aggregate Value is paid in the form of securities for which a public trading market existed prior to consummation of the Possible Transaction, the value of such securities, for purposes of calculating the Aggregate Value, will be determined by the closing or last sales price for such securities on the last trading day prior to the announcement of the Possible Transaction. If such securities do not have an existing public trading market, the value of the securities will be the mutually agreed upon fair market value on the day prior to the announcement of the Possible Transaction; provided that promissory notes or other debt obligations will be valued at the face amount thereof. Any amounts to be paid contingent upon future events shall be estimated for purposes of the Success Fee calculation at an expected value mutually agreeable to you and to us at the time of closing, except that amounts held in escrow shall be deemed paid at closing.

If any withholding or similar taxes are applicable to the fees and expenses payable hereunder, the amounts payable hereunder are intended to be net of all such withholding or similar taxes and the fees and expenses payable to Harris Nesbitt hereunder will be increased to such amounts as will result in the net amounts payable to Harris Nesbitt hereunder after applications of such withholding or similar taxes being equal to the amounts provided for in this letter agreement. For purposes of clarity, the Company shall not be responsible for any income taxes payable by Harris Nesbitt on Harris Nesbitt's income derived from the fees earned hereunder.

The payment of all fees shall be made in cash, in immediately available funds, promptly when due and are non-refundable. The Company shall also reimburse Harris Nesbitt for all reasonable out-of-pocket expenses incurred by Harris Nesbitt in connection with, or arising out of its entry into or the activities contemplated by, this letter agreement, including but not limited to travel and communication expenses, courier charges and the reasonable fees and disbursements of our counsel, and also the reasonable fees and

A member of BMO Financial Group



disbursements of any other consultants engaged by us with the prior consent of the Company. Such reimbursement expenses will be payable on receipt by the Company of our invoices, regardless of whether a Possible Transaction is consummated. Notwithstanding the foregoing, the Company shall not be obligated to reimburse more than $50,000 of out-of-pocket expenses so incurred unless such expenses in excess of $50,000 have been consented to or authorized by the Company; provided, however, that the foregoing limitation on expenses will not limit in any respect the indemnification contemplated by Section 6 or the Indemnity referred to therein.

5.   **Access to Information.**   The Company acknowledges that any review of the Company or a Possible Transaction will be based solely on publicly available information concerning the Company or on information which has been supplied by the Company. We will be entitled to rely on, and are under no obligation to verify, the accuracy or completeness of such information, and the Company represents that the information furnished to us with respect to the Company and its affiliates is accurate and correct in all material respects and that any projections, forecasts or other information provided to Harris Nesbitt will have been prepared in good faith and based upon reasonable assumptions. Further, we are under no obligation to investigate any changes which may occur in such information subsequent to the date thereof. The Company agrees to promptly notify Harris Nesbitt if the Company believes that any information which was previously provided to Harris Nesbitt or to any possible participant in any Possible Transaction, including any information contained in an Information Memorandum, has become materially misleading. The Company will inform us of all relevant information, meetings and decisions concerning the Possible Transaction and will disclose to us on a timely basis the existence and content of, and will furnish us with, or arrange that we be furnished with, all information (financial or otherwise), data, opinions, appraisals, valuations and other information and materials of whatsoever nature or kind, within the Company's possession, control or direction, or in respect of which the Company can, using its commercially reasonable efforts, obtain possession, control or direction, relating to the subject matter of a Possible Transaction and which we may reasonably require or deem appropriate in carrying out our engagement hereunder.

6.   **Indemnification.**   On the date hereof, the Company and Harris Nesbitt have entered into the Indemnity, which Indemnity forms part of this letter agreement and part of the consideration for the entering into of this letter agreement. Such Indemnity shall be executed and delivered to us on the execution of this letter agreement and shall be in addition to, and not in substitution for, any liability which the Company or any other person or entity may have apart from such Indemnity.

7.   **Termination.**   Harris Nesbitt's engagement hereunder may be terminated by either the Company or Harris Nesbitt at any time with or without cause upon written notice to the other party; provided, however, that (a) no such termination will affect Harris Nesbitt's right to fees or expense reimbursement then done under Section 4 hereof or the indemnification contemplated by Section 6 or the Indemnity and, (b) if the Company, directly or indirectly, consummates any Possible Transaction within twelve months following such termination with any party which Harris Nesbitt has identified or held substantial discussions with, then Harris Nesbitt will be entitled to the full amount of the Success Fee, as applicable, contemplated in Section 4, payable promptly upon consummation of such Possible Transaction.

8.   **Advertisements or Announcements.**   Harris Nesbitt may, at its own expense, place advertisements or announcements in any newspapers, periodicals, mailings, or other publications, or otherwise disclose to third parties, that Harris Nesbitt acted as financial advisor to the Company or performed any other services hereunder.

9.   **Corporate Obligations.**   The obligations of Harris Nesbitt hereunder are solely corporate obligations of Harris Nesbitt, and no officer, director, employee, agent, shareholder, controlling person or affiliate of



Harris Nesbitt shall be subject to any personal or separate liability whatsoever to any person, nor will any such claim be asserted by or on behalf of the Company under this letter agreement.

10.     **Other Matters.**  This letter agreement will inure to the benefit of and be binding upon the parties hereto and their respective successors and assigns.  The Company agrees not to assign its obligations hereunder without the prior written consent of Harris Nesbitt.  Harris Nesbitt agrees not to assign its obligations hereunder without the prior written consent of the Company.  This letter agreement shall be governed by and construed in accordance with the laws of the State of Illinois without giving effect to any laws relating to conflicts of laws.  Headings used herein are for ease of reference only and shall not affect the interpretation or construction of this letter agreement.  This letter agreement may be executed in counterparts, each of which shall be deemed an original and all of which shall constitute one and the same instrument.  No waiver, amendment or other modification of this letter agreement shall be effective unless in writing and signed by each party to be bound thereby.  This letter agreement (including Schedule A hereto) incorporates the entire understanding of the parties with respect to the subject matter hereof and supersedes all previous agreements, whether written or oral, should they exist with respect thereto.  The individuality or unenforceability of any provision of this letter agreement shall not affect the validity or enforceability of any other provision of this letter agreement, which shall remain in full force and effect pursuant to the terms hereof.  This letter agreement has been reviewed by the signatories hereto and their counsel.  There shall be no construction of any provision against Harris Nesbitt because this letter agreement was drafted by Harris Nesbitt, and the parties waive any statute or rule of law to such effect.

EACH OF HARRIS NESBITT AND THE COMPANY (ON ITS OWN BEHALF AND, TO THE EXTENT PERMITTED BY APPLICABLE LAW, ON BEHALF OF ITS AFFILIATES) WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED UPON CONTRACT, TORT OR OTHERWISE) RELATED TO OR ARISING OUT OF THE ENGAGEMENT OF HARRIS NESBITT PURSUANT TO, OR THE PERFORMANCE BY HARRIS NESBITT OF THE SERVICES CONTEMPLATED BY, THIS LETTER AGREEMENT.

All actions and proceedings arising out of or relating to this letter agreement shall be heard and determined exclusively in any Illinois state or federal court sitting in the City of Chicago, to whose jurisdiction the Company hereby irrevocably submits.  The Company hereby irrevocably waives any defense or objection to the Illinois forum designated above.

The Company acknowledges that Harris Nesbitt and its affiliates (collectively, the "BMO Financial Group Entities") may have and may in the future have investment and commercial banking, trust and other relationships with parties other than the Company, which parties may have interests with respect to the Company or its affiliates or a transaction with the Company or its affiliates.  Although the BMO Financial Group Entities in the course of such other relationships may acquire information about any such transaction or such other parties, the BMO Financial Group Entities shall have no obligation to disclose such information, or the fact that any of the BMO Financial Group Entities is in possession of such information, to the Company or to use such information on the Company's behalf.  In the ordinary course of our trading, brokerage, asset management and financing activities, the BMO Financial Group Entities may at any time trade or otherwise effect transactions for our own account or the accounts of customers, in equity or debt securities or senior loans of the Company or its affiliates or any other company that may be involved in a Possible Transaction.  Furthermore, the Company acknowledges that the BMO Financial Group Entities may have fiduciary or other relationships whereby the BMO Financial Group Entities may exercise voting power over securities of various persons, which securities may from time to time include securities of the Company or its affiliates or others with interests with respect to the Company or its affiliates or any transaction relating to the Company or its affiliates.  The Company acknowledges that the BMO Financial Group Entities may exercise such powers and otherwise perform its functions in connection with such fiduciary or other relationships without regard to its relationship to the Company hereunder.  The Company

A member of BMO Financial Group


**HARRIS NESBITT**

further acknowledges that an affiliate of Harris Nesbitt, Harris Bank, has a current lending relationship with the Company or its affiliates and may have an additional lending relationship with the Company or its affiliates in the future.

We are pleased to proceed with this engagement and look forward to working with the Company. If the foregoing is in accordance with your understanding, please indicate your agreement to the above terms and conditions by signing the enclosed copy of this letter agreement and returning it to us.

Yours very truly,

HARRIS NESBITT CORP.

By: _____

Tom L. Gerlacher
Managing Director

The foregoing is in accordance with
our understanding and is accepted and
agreed to by us this 3rd day of
August, 2005.

McKinley Medical L.L.C.

By: _____

A member of BMO Financial Group
CH1 3207964v.2



**Harris Nesbitt Corp.**
111 West Monroe Street
Chicago, IL 60603
www.harrisnesbitt.com

## Schedule A
### July 20, 2005

In connection with your engagement (the "engagement") pursuant to the letter agreement dated as of the date of this agreement, McKinley Medical LLC (the "Client" or "we") agree to indemnify and hold harmless Harris Nesbitt Corp. ("Harris Nesbitt" or "you") and its affiliates, the respective directors, officers, partners, agents and employees of Harris Nesbitt and its affiliates, and each other person, if any, controlling Harris Nesbitt or any of its affiliates (collectively, "Indemnified Persons"), from and against, and we agree that no Indemnified Person shall have any liability to us or our owners, parents, affiliates, officers, directors, employees, security holders or creditors for, any losses, claims, damages and liabilities (including actions or proceedings in respect hereof) (collectively "Losses") (A) related to or arising out of (i) our actions or failures to act (including statements or omissions made, or information provided, by us or our agents) or (ii) actions or failures to act by an Indemnified Person with our consent or in reliance on our actions or failures to act, or (B) otherwise related to or arising out of the engagement or your performance thereof, except that this clause (B) shall not apply to any Losses that are judicially determined to have resulted from your bad faith, gross negligence or willful misconduct. If such indemnification is for any reason not available or insufficient to hold the Indemnified Persons harmless, we agree to contribute to the Losses involved in such proportion as is appropriate to reflect the relative benefits received (or anticipated to be received) by us and by you with respect to the engagement or, if such allocation is judicially determined to be unavailable, in such proportion as is appropriate to reflect other equitable considerations such as the relative fault of us on the one hand and of you on the other hand; provided, however, that, to the extent permitted by applicable law, the Indemnified Persons shall not be responsible for amounts which in the aggregate are in excess of the amount of all fees actually received by you from us in connection with the engagement. Relative benefits to us, on the one hand, and you, on the other hand, with respect to the engagement shall be deemed to be in the same proportion as (i) the total value paid or received or proposed to be paid or received by us or our security holders, as the case may be, pursuant to the transaction(s), whether or not consummated, contemplated by the engagement bears to (ii) all fees actually received by you in connection with the engagement.

We will reimburse each Indemnified Person for all expenses (including without limitation reasonable fees and disbursements of counsel and expenses incurred in connection with preparing for and responding to third party subpoenas) as they are incurred by such Indemnified Person in connection with investigating, preparing for or defending any action, claim, investigation, inquiry, arbitration or other proceeding ("Action") referred to above (or enforcing this agreement or any related engagement agreement), whether or not in connection with pending or threatened litigation in which any Indemnified Person is a party. We further agree that we will not settle or compromise or consent to the entry of any judgment in any pending or threatened Action in respect of which indemnification may be sought hereunder (whether or not an Indemnified Person is a party therein) unless we have given you reasonable prior written notice thereof and unless (i) Harris Nesbitt, by name, and the other Indemnified Persons, by description, are included in any release or settlement agreement, whether or not Harris Nesbitt and the other Indemnified Persons are named as defendants in such litigation or proceeding, (ii) Harris Nesbitt and the other Indemnified Persons are unconditionally released from all claims and liabilities asserted or which could have been asserted in such litigation, investigation or proceeding and (iii) there is no statement in any such release or settlement agreement as to an admission of fault, culpability or failure to act by or on behalf of Harris Nesbitt or the other Indemnified Persons. In the event we are considering entering into one or a series of transactions involving a sale of all or a significant portion of our assets or other business combination, unless otherwise requested or agreed by Harris Nesbitt, we will cause the purchaser of such assets or the surviving company resulting from such business combination, as applicable, to assume our obligations set forth herein on terms and conditions reasonably satisfactory to Harris Nesbitt, unless such obligations are transferred to the purchaser or the surviving company by operation of law

If multiple claims are brought against you in any Action with respect to at least one of which indemnification is permitted under applicable law and provided for under this agreement, we agree that any judgment, arbitration award or other monetary award shall be conclusively deemed to be based on claims as to which indemnification is so permitted and provided for. Our obligations hereunder shall be in addition to any other rights that any Indemnified Person may have at common law or otherwise. Solely for the purpose of enforcing this agreement, we hereby consent to personal jurisdiction and to service and venue in any court in which any claim which is subject to this agreement is brought by or against any Indemnified Person. YOU HEREBY WAIVE, AND WE HEREBY WAIVE ON OUR OWN BEHALF AND, TO THE EXTENT PERMITTED BY APPLICABLE LAW, ON BEHALF OF OUR SECURITYHOLDERS ANY RIGHT TO TRIAL BY JURY WITH RESPECT TO ANY CLAIM, COUNTER-CLAIM OR ACTION ARISING OUT OF THE ENGAGEMENT, YOUR PERFORMANCE THEREOF OR THIS AGREEMENT.

 **HARRIS NESBITT**

Promptly after receipt by an Indemnified Person of notice of any complaint or the commencement of any proceeding with respect to which indemnification is being sought hereunder, such Indemnified Person will notify the Company of such complaint or commencement of such proceeding; provided, that the failure to give such notice will not relieve the Company from any liability which may arise hereunder, except to the extent that such failure materially prejudices the defense of such proceeding. If the Company so elects, the Company will assume the defense of such proceeding, including the employment of counsel reasonably satisfactory to the Indemnified Persons and the payment of the fees and expenses of such counsel. In the event that the Indemnified Person reasonably determines in its judgment that having common counsel would present actual or potential conflicts of interest, the Indemnified Person may employ separate counsel to represent or defend it any such proceeding and the Company will pay the reasonable fees and expenses of separate counsel for the Indemnified Persons in connection with such proceeding. Notwithstanding any provision herein to the contrary, it is hereby expressly agreed that (x) an Indemnified Person may consult with its counsel in connection with such Indemnified Person's involvement in a proceeding the defense of which has been assumed by the Company and that the Company will reimburse such Indemnified Person for the reasonable fees and expenses of such counsel incurred by such Indemnified Person in connection with any such consultation and (y) an Indemnified Person and its counsel shall have the right (at the Company's expense) to defend and to make the final decision on matters affecting the conduct of such proceeding with respect to any allegation that such Indemnified Person is not entitled to be indemnified by the Company.

The provisions of this agreement shall apply to the engagement (including related activities prior to the date hereof) and any modification thereof and shall remain in full force and effect regardless of the completion or termination of the engagement and shall be binding upon our successors and assigns. This agreement and any other agreements relating to the engagement shall be governed by and construed in accordance with the laws of the State of Illinois, without regard to conflicts of law principles.

Very truly yours,
Client: McKinley Medical LLC

By: _____
David Maytubby
Title: Chief Financial Officer

Accepted and agreed to as of the date hereof:
HARRIS NESBITT CORP.

By: _____
Tom L. Gerlacher
Title: Managing Director

**EXHIBIT B**

SECURITIES AND EXCHANGE COMMISSION

Washington, DC 20549

FORM 8-K

CURRENT REPORT

Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934

Date of Report (Date of earliest event reported):  **August 23, 2006**

# MOOG INC.

(Exact name of registrant as specified in its charter)

| **New York** | **1-5129** | **16-0757636** |
|---|---|---|
| (State or Other Jurisdiction of Incorporation) | (Commission File Number) | (I.R.S. Employer Identification No.) |

| **East Aurora, New York** | **14052-0018** |
|---|---|
| (Address of principal executive offices) | (Zip Code) |

Registrant's Telephone Number, Including Area Code:  **(716) 652-2000**

**N/A**

(Former name or former address, if changed since last report)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions (see General Instruction A.2. below):

[ ] Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)
[ ] Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)
[ ] Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))
[ ] Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

**Item 3.02  Unregistered Sales of Equities Securities**

**Item 8.01  Other Events.**

On August 24, 2006, Moog Inc., Moog Inc. (the "Company") acquired all of the outstanding shares of McKinley Medical Corporation ("McKinley") from McKinley Medical, LLC (the "Seller") pursuant to an Agreement and Plan of Merger (the "Merger Agreement") dated as of July 14, 2006 (the "Merger"). McKinley, located in Denver, Colorado, designs, assembles and distributes disposable pumps and accessories used principally to administer therapeutic drugs for chemotherapy and antibiotic applications, and post-operative medication for pain management.

The consideration for the Merger was $15 million, which was paid by the Company's issuance of 445,725 shares (the "Shares") of the Company's Class A common stock to the Seller. The issuance of the Shares to the Seller was exempt from registration with the U.S. Securities and Exchange Commission pursuant to the exemption from such registration under Section 4(2) of the Securities Act of 1933, as amended, for a sale not involving a public offering. The Company will file a registration statement with respect to the Shares later this year.

On August 28, 2006, the Company issued a press release announcing the completion of the Merger. A copy of the press release is set forth as Exhibit 99.1 hereof.

**Item 5.03  Amendments to Articles of Incorporation or Bylaws; Change in Fiscal Year.**

On August 23, 2006, the Company's Board of Directors adopted a resolution changing the Company's fiscal year. Effective with the Company's current fiscal year, the fiscal year of the Company will end each year on the Saturday in September or October that is closest to September 30. Previously, the Company's fiscal year ended on the last Saturday in September.

**Item 9.01  Financial Statements and Exhibits.**

(d) Exhibits.

99.1    Press release dated August 28, 2006

SIGNATURE

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

**MOOG INC.**

Dated:  August 28, 2006

By:       /s/ Donald R. Fishback

Name:   Donald R. Fishback
          Controller

**EXHIBIT INDEX**

<u>Exhibit</u>        <u>Description</u>

99.1        Press release dated August 28, 2006

# press information

$\mathrm{MOOG}$ INC., EAST AURORA, NEW YORK 14052  TEL-716/652-2000  FAX -716/687-4457

**release date**        Immediate        **contact**        Ann Marie Luhr
                       August 28, 2006                       716-687-4225

## MOOG ANNOUNCES MEDICAL DEVICES ACQUISITION

East Aurora, NY, Moog Inc. (NYSE: MOG.A and MOG.B) announced today that it closed on a merger of McKinley Medical Corporation based in Denver, Colorado into Moog on August 24, 2006. McKinley Medical Corporation was a wholly owned subsidiary of McKinley Medical, LLC, an affiliate of The Broe Companies, Inc., a private company headquartered in Denver. McKinley Medical Corporation designs, assembles and distributes disposable pumps and accessories used principally to administer therapeutic drugs for chemotherapy and antibiotic applications, and post-operative medication for pain management. These medical devices are marketed under the brand names Accufuser and BeeLine. Moog paid $15 million in the form of 445,725 shares of Moog Class A common stock in exchange for the shares of McKinley Medical Corporation.

The acquisition expands the Company's participation in the medical devices market, particularly infusion therapy, adding to the Company's April 2006 acquisition of Curlin Medical. Infusion pumps provide a controlled flow of therapeutic drugs to patients in hospital and outpatient settings.

Sales associated with McKinley Medical Corporation products in the previous twelve months were approximately $5 million. This acquisition's impact on Moog's Earnings Per Share for the year ending September 30, 2006 will be neutral after considering the effects of financing and related purchase accounting adjustments.

In FY2007, Moog's Medical Devices segment sales will approach $40 million including $7 million associated with McKinley Medical. The Company reaffirmed its projected 2007 operating margins for the Medical Devices segment at 20% and its projected 2007 Earnings Per Share to a range of $2.21 to $2.29, with a midpoint estimate of $2.25. This represents an increase of 15% over the Company's most recent 2006 EPS estimate.

"Moog made a careful study of the medical device market and determined that a broad line of
pumps and associated accessories fit well with our technical and manufacturing capabilities," said Martin
Berardi, Vice President and head of the new Medical Device Segment. "We're very excited about the
addition of the McKinley Medical pumps. They compliment our Curlin Medical products by offering an
alternative approach to administering medication for infusion therapy, and they provide us with a
presence in the emerging post operative pain management market."

Moog Inc. is a worldwide designer, manufacturer, and integrator of precision control components
and systems. Moog's high-performance systems control military and commercial aircraft, satellites and
space vehicles, launch vehicles, missiles, automated industry machinery, and medical equipment.
Additional information about the company can be found on its website, www.moog.com.


**Cautionary Statement**

Information included herein or incorporated by reference that does not consist of historical facts, including statements
accompanied by or containing words such as "may," "will," "should," "believes," "expects," "expected," "intends," "plans," "projects,"
"estimates," "predicts," "potential," "outlook," "forecast," "anticipates," "presume" and "assume," are forward-looking statements.
Such forward-looking statements are made pursuant to the safe harbor provisions of the Private Securities Litigation Reform Act of
1995. These statements are not guarantees of future performance and are subject to several factors, risks and uncertainties, the
impact or occurrence of which could cause actual results to differ materially from the expected results described in the forward-
looking statements. These important factors, risks and uncertainties include (i) fluctuations in general business cycles for
commercial aircraft, military aircraft, space and defense products, industrial capital goods and medical devices, (ii) our dependence
on government contracts that may not be fully funded or may be terminated, (iii) our dependence on certain major customers, such
as The Boeing Company and Lockheed Martin, for a significant percentage of our sales, (iv) the possibility that the demand for our
products may be reduced if we are unable to adapt to technological change, (v) intense competition which may require us to lower
prices or offer more favorable terms of sale, (vi) our significant indebtedness which could limit our operational and financial
flexibility, (vii) the possibility that new product and research and development efforts may not be successful which could reduce our
sales and profits, (viii) higher pension costs and increased cash funding requirements, which could occur in future years if future
actual plan results differ from assumptions used for our defined benefit pension plans, including returns on plan assets and
discount rates, (ix) a write-off of all or part of our goodwill, which could adversely affect our operating results and net worth and
cause us to violate covenants in our bank agreements, (x) the potential for substantial fines and penalties or suspension or
debarment from future contracts in the event we do not comply with regulations relating to defense industry contracting, (xi) the
potential for cost overruns on development jobs and fixed price contracts and the risk that actual results may differ from estimates
used in contract accounting, (xii) the possibility that our subcontractors may fail to perform their contractual obligations which may
adversely affect our contract performance and our ability to obtain future business, (xiii) our ability to successfully identify and
consummate acquisitions and integrate the acquired businesses, and the risks associated with acquisitions, including that the
acquired businesses do not perform in accordance with our expectations, and that we assume unknown liabilities in connection
with the acquired businesses and that indemnification from the

, of the acquired businesses continue or the liabilities will be limited or unavailable, (xiv) our dependence on our management team and key personnel, (xv) the possibility of a catastrophic loss of one or more of our manufacturing facilities, (xvi) the possibility that future terror attacks, war or other civil disturbances could negatively impact our business, (xvii) our operations in foreign countries could expose us to political risks and adverse changes in local, legal, tax and regulatory schemes, (xviii) the possibility that government regulation could limit our ability to sell our products outside the United States, (xix) the impact of product liability claims related to our products used in applications where failure can result in significant property damage, injury or death and in damage to our reputation, (xx) the possibility that litigation may result unfavorably to us, (xxi) foreign currency fluctuations in those countries in which we do business and other risks associated with international operations and (xxii) the cost of compliance with environmental laws. The factors identified above are not exhaustive. New factors, risks and uncertainties may emerge from time to time that may affect the forward-looking statements made herein. Given these factors, risks and uncertainties, investors should not place undue reliance on forward-looking statements as predictive of future results. We disclaim any obligation to update the forward-looking statements made in this report.