IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| BMO CAPITAL MARKETS CORP. f/k/a HARRIS NESBITT CORP., <br><br>    Plaintiff, <br><br> v. <br><br> MCKINLEY MEDICAL LLC <br><br>    Defendant. | No. 06 C 6071 <br><br> Judge Der-Yeghiayan <br> Magistrate Judge Schenkier |

**BMO CAPITAL MARKETS CORP'S MEMORANDUM OF LAW
IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

### I.   INTRODUCTION

This is a straightforward breach of contract case. Both parties are sophisticated commercial entities which negotiated, through counsel, a clear, unambiguous contract. That contract stated that BMO Capital Markets Corp. ("*BMO*"), would act as investment advisor to McKinley Medical LLC ("*McKinley*") as to a potential merger of any part of McKinley's business with another company. The fee payment provision of the contract explicitly stated that McKinley would pay BMO $650,000 if McKinley consummated a merger with Moog, Inc. ("*Moog*"). McKinley consummated a merger with Moog in August, 2006, but refused to pay BMO as agreed. This is a breach of the parties' unambiguous contract. It is that simple.

Further, each of McKinley's proffered affirmative defenses and other factual denials are explicitly contradicted by the unambiguous terms of the parties' contract, as well as McKinley's own admissions. BMO has done what is required under the contract; McKinley has not. Summary judgment should be granted in favor of BMO.

## II. STATEMENT OF FACTS

BMO has contemporaneously submitted a Local Rule 56.1 Statement of Material Facts for which there is no genuine issue. In this Memorandum, each citation to this Statement of Facts will be noted as "Rule 56.1 Stmt, ¶ ___."

## III. LEGAL STANDARD

Summary judgment is appropriate when the record, viewed in the light most favorable to the non-moving party, reveals that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c).

## IV. LAW AND ARGUMENT

### A. MCKINLEY HAS BREACHED THE EXPRESS, UNAMBIGUOUS TERMS OF THE ENGAGEMENT LETTER

BMO's Complaint asserts a claim for breach of contract based on McKinley's failure to perform, as promised, by the terms of the Engagement Letter entered into between the parites. To establish this claim under Illinois law, BMO must show: "(1) the existence of a valid and enforceable contract; (2) the performance of the contract by plaintiff; (3) the breach of the contract by defendant; (4) a resulting injury to the plaintiff." *Priebe v. Autobarn, Ltd.*, 240 F.3d 584, 587 (7th Cir. 2001). BMO has shown that there is no genuine issue of material fact as to the any of these factors, and thus that summary judgment is appropriate.

"The role of the court is to enforce a valid contract . . . and when the terms of a contract are clear and unambiguous, they must be enforced." *Newcastle Prop., Inc. v. Shalowitz*, 221 Ill. App. 3d 716, 722, 582 N.E.2d 1165, 1168 (1st Dist. 1991). When a contract is unambiguous, no disputed question of fact exists and summary judgment is proper. *See Ebert v. Dr. Scholl's Foot Comfort Shops, Inc.*, 137 Ill. App. 3d 550, 558, 484 N.E.2d 1178, 1184 (1985). Thus, contract interpretation is particularly suited for disposition on summary judgment. *See Metalex Corp. v.*

2

*Uniden Corp. of Am.*, 863 F.2d 1331, 1333 (7th Cir. 1988).

    1.    **The Engagement Letter Is Unambiguous**

As to a contract with a full integration clause – like the Engagement Letter here – Illinois follows the "four-corners" rule, which mandates that the intent of the parties is to be determined solely from the Engagement Letter itself, and parol evidence may be reviewed by this Court only if the contract is "facially ambiguous," *i.e.*, susceptible to more than one meaning . *See Air Safety, Inc. v. Teacher Realty Corp.*, 185 Ill.2d 457, 462-63, 706 N.E.2d 882, 884 (1999). "The mere fact that the parties do not agree upon the meaning of the terms of a contract does not create an ambiguity." *See Newcastle Prop., Inc.*, 221 Ill. App. 3d at 722-23, 582 N.E.2d at 1169.

The Engagement Letter which forms the core of this case is plainly unambiguous. *See* Rule 56.1 Stmt, ¶10. Its terms are clear and complete, its meanings are obvious, and it is not facially ambiguous. The key terms at issue – "Possible Transaction" and "Success Fee" – are expressly defined in detail. It is not susceptible to more than one meaning, a fact conceded by McKinley, which has not offered any defense of ambiguity. *See* Ans. and Aff. Def., ¶¶1-4. Its terms are clear: when McKinley closed its "Possible Transaction" with Moog, it was to pay BMO $625,000. Period.

    2.    **A "Possible Transaction" Was Consummated Between McKinley And Moog**

        **i.    Any Merger Qualifies As a "Possible Transaction"**

The term "Possible Transaction" is specifically defined in the Engagement Letter to include <u>any</u> merger between McKinley and another company. Specifically, the definition of "Possible Transaction" is "a possible sale of all or a substantial portion of the stock or assets of the Company, a joint venture with **and/or a merger** . . . involving the Company or one or more

3

of its affiliates." *See* Rule 56.1 Stmt, ¶13 (emphasis added).[1] The term "'or' is disjunctive . . . [which] marks an alternative indicating the various parts of the sentence which it connects are to be taken separately . . . [and] therefore connotes two different alternatives." *Elem. Sch. Dist. 159 v. Schiller*, 221 Ill.2d 130, 145-46, 849 N.E.2d 349, 360 (2006). Thus, the Engagement Letter presented different alternatives for the "Possible Transaction," one of which was "a merger . . . involving the Company or one or more of its affiliates." A merger occurred between Moog and a McKinley affiliate. *See* Rule 56.1 Stmt, ¶¶50, 51. Therefore, a "Possible Transaction" with Moog occurred.

### ii. Regardless, the Merger Was For a "Substantial Portion" of McKinley's Assets

However, even if the word "or" were excluded from the definition of "Possible Transaction," and the term "merger" was qualified by the descriptor "all or a substantial portion of the stock or assets of the Company" (which it is not), the merger with Moog still qualified as a "Possible Transaction" because Accufuser and beeLINE were unquestionably "a substantial portion" of McKinley's assets. Under Illinois law, contract terms must be given their "plain, ordinary, popular, and natural meaning." *See Newcastle Prop., Inc.*, 221 Ill. App. 3d at 723, 582 N.E.2d at 1169  The term "substantial" means "considerable in importance, value, degree, amount or extent." *See* American Heritage Dictionary (4th Ed. 2000).

There is simply no question that beeLINE and Accufuser were McKinley's most important and valuable product lines. McKinley formulated its 2004 business plan around them because they represented McKinley's "biggest opportunity for growth." *See* Rule 56.1 Stmt, ¶5. They were McKinley's biggest revenue generators. *See id.*, ¶5. The financials in the CIM identify

---

[1] Because the Complaint is based on only one transaction – the merger with Moog – the term "and" in the "and/or" transition is irrelevant.

these products as comprising 37% of McKinley's revenues in 2003, 53% in 2004, and 51% in 2005. *See* ¶24. Further, the financial projections provided to Moog by McKinley during their initial discussions had highlighted Accufuser as McKinley's single most important product; McKinley projected Accufuser alone to comprise 72% of revenues by the year 2009, and both Accufuser and beeLINE to comprise 79% of 2009 revenues. *See id.,* ¶8. In addition, not only did Moog eventually acquire beeLINE and Accufuser, it early on had identified beeLINE and Accufuser as McKinley's most promising and valuable product lines. *See id.,* ¶6. This was the conclusion of BMO's team as well when the Engagement Letter was entered into. *See id.,* ¶17.

Thus, there is no question whatsoever, much less a genuine issue of material fact, that McKinley consummated a "Possible Transaction" with Moog as specifically contemplated by ¶4(b) of the Engagement Letter.

    **3.    The Merger Between McKinley and Moog Required Payment of a Success Fee Pursuant to The Unambiguous Terms of The Engagement Letter**

When "the language of a contract unambiguously provides an answer to the question at hand, the inquiry is over." *See Grub & Ellis Co. v. Bradley Real Estate Trust*, 909 F.2d 1050, 1055 (7th Cir. 1990). As related above, the unambiguous terms of the Engagement Letter tie BMO's compensation directly to McKinley's consummation of a "Possible Transaction," and such a transaction with Moog is specifically covered by the Engagement Letter: a "Success Fee" is "payable in respect of any Possible Transaction that is consummated and payable on the closing thereof" and "the case that the Possible Transaction involves one of the parties known to us and to you as Smiths Medical, DJ Orthopedics or Moog, Inc.; then such Success Fee shall not be less than $650,000." *See* Rule 56.1 Stmt, ¶¶14, 15.

Thus, as soon as the Possible Transaction closed between McKinley and Moog, ¶4b of the Engagement Letter was triggered, and McKinley was obligated to pay BMO $625,000, as

5

agreed.[2] In the nearly identical case of *Grub & Ellis Co. v. Bradley Real Estate Trust*, 909 F.2d 1050 (7th Cir. 1990), Bradley hired Grub & Ellis as its real estate sales agent for the sale of a building. *See id*, p. 1051. The parties entered into a letter agreement which stated that "Commission on sales will be paid to Grub & Ellis only upon consummation of a sale for which a contract has been entered into (a) during the term of agency." *See id*., at 1055. Grub & Ellis marketed the building, but a different agent ultimately negotiated and sold the building to its own buyer not identified by Grub & Ellis. *See id*., at 1052. After the sale, Grub & Ellis demanded its commission, but Bradley refused to pay, arguing that Grub & Ellis did not "earn" the commission because it did not ultimately close the sale. *See id*., at 1051-53.

Hogwash, said the Seventh Circuit. Identifying the case as "a straightforward case of contract construction," the Seventh Circuit held that the contract at issue "unambiguously provides for payment of a commission to Grub & Ellis upon sale of the building, <u>without regard to Grub & Ellis's role in the sale</u>." *See id*., p. 1053, 1055 (emphasis added). Thus, as soon as the sale was consummated, Bradley owed Grub & Ellis a commission, regardless of the fact that another party actually closed the deal. *See id*. In fact, Seventh Circuit stated that because the contract language was unambiguous, and Grub & Ellis was so obviously entitled to a commission, "the only pertinent issue regarding Grub & Ellis's role in the sale relates to the *amount* of the commission owed to Grub & Ellis." *See id*., at 1054 (italics in original).

Similar is the recent case of *Blender v. Am. Feed & Farm Supply, Inc*., 04 C 4108, 2005 WL 43258, (N.D. Ill. Jan. 7, 2005), an unreported case of which a copy is attached hereto as Exhibit A, in which Blender was hired by American to obtain financing for American, and the contract's success fee was due upon closing with a source with whom Blender interacted. *See*

---

[2] The $625,000 figure is net of the initial $25,000 Base Fee paid by McKinley at the start of the engagement. *See* Rule 56.1 Stmt, ¶52.

*id.*, at *1.

As part of this process, Blender prepared a financing profile which he sent to potential funding sources along with a non-disclosure agreement ("*NDA*"). *Id.*, at *2. If the NDA was returned signed, Blender provided American's name and full financial information. *Id.* Blender contacted a number of potential partners for American, and received returned NDAs. *Id.* He also contacted a company called Textron, which did not return a signed NDA. *Id.* Blender's engagement was later terminated, and American closed a financing deal with Textron in which Blender did not participate. *Id.*

The Court therein *sua sponte* granted summary judgment in favor of Blender on the success fee issue. The court held that the contract was unambiguous, and Blender met the terms of the contract, and therefore had a earned a success fee, as defined by the agreement:

> The contract is unambiguous. The termination agreement clearly provides Blender was entitled to a success fee if: (1) American closed a transaction; (2) with a lender; (3) with whom Blender had interacted; (4) within 12 months after the agreement was terminated. It is undisputed that Blender communicated with Textron in at least two telephone calls and an e-mail on American's behalf. American argues the communications were not on its behalf because Textron did not know American's identity and there was no interaction because there was no signed NDA. These arguments lack merit. . . . Although Blender did not receive a signed NDA or negotiate with Textron, the agreement did not require those actions for the award of a success fee. . . . Blender forwarded the NDA and American's blind profile to Textron and communicated with Textron's Texas and Illinois offices on American's behalf. He did not negotiate or close the deal. However, all that was required was interaction with the lending source during the agreement's tenure.

*See id.*, at *6. *See also Bass v. Banga*, 656 F.Supp. 312, 315-16 (N.D. Ill. 1987) (granting broker's motion for summary judgment for success fee because while broker did not close deal, contract did not tie success fee to broker's actions, but rather the defendant's consummation of a sale); *Lehman Bros. Kuhn Loeb, Inc. v. Clark Oil & Refining Corp.*, 739 F.2d 1313, 1317 (8th

7

Cir. 1984) (affirming summary judgment in favor of investment bank on contract claim for success fee because investment bank met conditions of unambiguous contract).

The logic of these cases is on all-fours with the present case; BMO is entitled to a $625,000 Success Fee under the unambiguous terms of the Engagement Letter, even if McKinley mistakenly believed that BMO had to do something other than called for by the Engagement Letter to warrant the carved-out Success Fee. *See* Rule 56.1 Stmt, ¶46. As Illinois law mandates, McKinley's belief as to whether BMO has metaphysically "earned it" is irrelevant; the unambiguous language of the contract is what matters. *See Grub & Ellis Co.*, 909 F.2d at 1057; *see also FSC Paper Corp. v. Sun Ins. Co. of N.Y.*, 744 F.2d 1279, 1283 n.5 (7th Cir. 1984) (stating that courts will not construe unambiguous contracts to include provisions that are not there to create a result deemed more equitable by one party to the dispute). If McKinley wished to tie payment of the Success Fee to BMO closing the deal, or if McKinley did not wish to carve out Moog for a specific amount of a Success Fee, it should have done so when its counsel was negotiating the Engagement Letter. As the Seventh Circuit succinctly put it:

> It is not our function to reform the plain language of an . . . agreement to the obvious advantage of one party and to the obvious detriment of another. It is possible, of course, that Bradley wanted to pay Grub & Ellis only if Grub & Ellis procured the sale of the Champlain building during the term of the . . . agreement. But if this was Bradley's objective, it should have said so in the agreement. It is too late for it so say so now.

*Grub & Ellis Co.*, 909 F.2d at 1057. *See also Emergency Med. Care, Inc. v. Marion Mem. Hosp.*, 94 F.3d 1059, 1062 (7th Cir. 1996) (holding that interpretation of contract contrary to words of actual contract "fails a common sense rule of contract interpretation" because, if one party wanted it to say something different, "the contract should have said so"). Summary judgment should be granted in favor of BMO and against McKinley pursuant to Federal Rule of Civil Procedure 56. *See Grub & Ellis Co.*, 909 F.2d at 1055; *Bass*, 656 F.Supp. at 315-16;

*Blender*, 2005 WL 43258, at *6.

**B.   MCKINLEY'S AFFIRMATIVE DEFENSES ARE CONTRADICTED BY THE UNAMBIGUOUS TERMS OF THE ENGAGEMENT LETTER, AND BY ITS OWN TESTIMONY**

As noted above, "the inquiry is over," and no further factual examination is required, because the language of the Engagement Letter "unambiguously provides an answer to the question at hand." *See Grub & Ellis Co.*, 909 F.2d at 1055 (7th Cir. 1990). However, McKinley's proffered Affirmative Defenses reference extrinsic evidence of "intent" not otherwise found within the four-corners of the Engagement Letter. Accordingly, and to the extent further factual analysis is deemed necessary, BMO will address McKinley's Affirmative Defenses.

McKinley's Affirmative Defenses are completely undercut by the unambiguous terms of the Engagement Letter. As such, they are without merit. Further, even a cursory examination of the undisputed facts and documents in evidence shows that McKinley's Affirmative Defenses are baseless, and provide no defense to BMO's Motion for Summary Judgment.

**1.   The Engagement Letter, By Its Terms, is Not Limited to Moog, and McKinley Retained BMO To Create An Auction Process**

Specifically, McKinley's first Affirmative Defense alleges that the basis of the Engagement Letter was for BMO to sell a substantial portion McKinley's assets to Moog based on a prior offer Moog had made to McKinley. *See* Aff. Def., ¶1. This is quite obviously <u>not</u> what the Engagement Letter <u>actually says</u>. In addition to the rule discussed above – that when the language of a contract unambiguously provides an answer to the question at hand, the inquiry is over – it is equally axiomatic that when an exhibit contradicts allegations in a pleading based on that exhibit, "the exhibit[] trump[s] the allegations." *See Smith v. Cash Store Management, Inc.*, 195 F.3d 325, 324, n.1 (7th Cir. 1999). The Engagement Letter is <u>not</u> limited to Moog, never mentions any alleged "prior offer" from Moog, and does not even invoke BMO's "best

9

efforts." To the contrary, the Engagement Letter contemplates <u>any</u> "Possible Transaction," and carves out a fee related to Moog and two other potential participants. *See* Rule 56.1 Stmt, ¶¶13, 15. In short, the Engagement Letter plainly contradicts the allegations of McKinley's first Affirmative Defense, and Engagement Letter trumps those allegations and ends the inquiry. *See Smith*, 195 F.3d at 324, n.1.

However, even if this Court were to review extrinsic evidence, McKinley's CFO testified that the purpose of entering into the Engagement Letter with BMO was not specifically to close a deal with Moog, but rather to create an auction process to encourage multiple bids and that, while the sales process was ongoing, the focus was on getting as many bids as possible and not on Moog. *See* Rule 56.1 Stmt, ¶¶9, 33. Further, BMO did, in fact, contact Moog, and Moog's rejection of the CIM was not based on anything BMO did or could have done, but rather McKinley's own unprofitability. *See id.*, ¶36. Thus, McKinley's first Affirmative Defense is of no merit and creates no genuine issue of material fact.

### 2. The Engagement Letter, By Its Terms, Specifically Contemplated a Transaction Involving Less Than All of McKinley's Assets

Similarly, the Engagement Letter contradicts McKinley's second Affirmative Defense, which alleges that the Engagement Letter "was never intended" to apply to anything less than a sale of all of McKinley's assets. *See* Aff. Def., ¶2. Much like the first Affirmative Defense, these allegations are directly contradicted by the express, unambiguous terms of the Engagement Letter. Specifically, as discussed above, the Engagement Letter defines the term "Possible Transaction" as "a possible sale of all **<u>or a substantial portion</u>** of the stock or assets of the Company, a joint venture with **<u>and/or</u>** a merger, consolidation, recapitalization, exchange or other business combination involving the Company or one or more of its affiliates." *See* Rule 56.1 Stmt, ¶13 (emphasis added). Again, this express term of the Engagement Letter trumps

10

McKinley's contradictory allegations and renders the second Affirmative Defense null. *See Smith*, 195 F.3d at 324, n.1.

However, even if this Court were to examine extrinsic evidence, it is undisputed that the McKinley sales process contemplated a factional sale of McKinley's assets. In addition to the Engagement Letter, the CIM – which was reviewed and approved by McKinley – also expressly stated that "[McKinley] has engaged [BMO] as its exclusive financial advisor to solicit and review proposals to purchase an interest for **up to 100%** of [McKinley]." *See* Rule 56.1 Stmt, ¶23 (emphasis added). Further, BMO drafted the CIM to present the McKinley product lines individually in order to elicit interest in those product lines individually. *See id.,* ¶25. Finally, through its sales process, BMO cultivated Cardinal's interest in beeLINE only, and presented that interest to McKinley, which eventually met with Cardinal based on BMO's work. *See id.,* ¶¶37-39. Thus, McKinley's second Affirmative Defense is of no merit and creates no genuine issue of material fact.

### 3. BMO Introduced A Potential Participant To McKinley For Less Than All of McKinley's Assets, But McKinley Chose to Close a Different Deal

McKinley's third Affirmative Defense is equally meritless. That Affirmative Defense alleges that BMO "breached its duty to use its best efforts" to find a purchaser for a part of McKinley's business. *See* Aff. Def., ¶3. Just like McKinley's first and second Affirmative Defenses, these allegations are contradicted by the Engagement Letter. Not only is the fundamental basis of the Engagement Letter a "Possible Transaction" for less than all of McKinley, nowhere in the Engagement Letter are BMO's "best efforts" discussed; the Engagement Letter is simply not phrased in this way, and therefore trumps McKinley's allegations otherwise. *See Smith*, 195 F.3d at 324, n.1.

However, even if extrinsic evidence were examined, the Third Affirmative Defense is equally specious. Not only did the Engagement Letter and CIM specifically discuss a partial

sale, but BMO, through its efforts in the sales process, specifically brought to McKinley's attention Cardinal, which expressed interest in beeLINE <u>only</u>. See Rule 56.1 Stmt, ¶¶37-39. Further, McKinley discussed with BMO selling only Accufuser and beeLINE. See *id.*, ¶37-38. McKinley cannot seriously argue that BMO was uninterested in selling McKinley's individual products, when it has admitted that BMO's sales process elicited interest in exactly that. Thus, McKinley's third Affirmative Defense is of no merit and creates no genuine issue of material fact.

    **4. The Engagement Letter Was Never Terminated**

        **i. The Engagement Letter Required Written Termination To the Party Being Terminated From the Terminating Party, Which McKinley Never Did**

McKinley's fourth Affirmative Defense is also undercut by the Engagement Letter. Specifically, McKinley alleges that the Engagement Letter was "terminated in March of 2006 and such termination was acknowledged in writing by BMO in April 2006." See Aff. Def., ¶4. However, the Engagement Letter is explicit that "[BMO's] engagement hereunder may be terminated by either [McKinley] or [BMO] at any time with or without cause **<u>upon written notice to the other party</u>** . . . ." See Rule 56.1 Stmt, ¶18. Herein, McKinley has admitted that the alleged "termination" was made orally, not in writing. See *id.*, ¶41. Further, the alleged "writing" – which does not even mention termination of the Engagement Letter – was not made **to** BMO **by** McKinley, as required by the Engagement Letter. See *id.*, ¶42. Thus, the alleged "termination" did not conform to the terms of the Engagement Letter and was of no force under the express terms of the Engagement Letter.

        **ii. By Accepting The Benefits Of The Engagement Letter After The Alleged "Termination," McKinley is Estopped From Denying Its Obligations Thereunder**

However, even if this Court were to ignore the Engagement Letter and examine the alleged "termination," McKinley's conduct thereafter renders such "termination" null and void.

Specifically, even after the date of the alleged termination, McKinley: (a) discussed internally (in response to communication from BMO) using KCI and Cardinal as leverage against Moog; directed BMO to continue to pursue Cardinal and KCI; and, as late as June 2006 (three months after the alleged "termination"), McKinley was corresponding with BMO about a potential deal with Cardinal. *See* Rule 56.1 Stmt, ¶¶44-45. Under Illinois law, "[a] party that accepts the benefits of an agreement is estopped from denying its existence or from performing obligations under the agreement." *Grot v. First Bank of Schaumburg*, 292 Ill. App. 3d 88, 93, 684 N.E.2d 1016, 1020 (1st Dist. 1997). Thus, even if McKinley had terminated the Engagement Letter (which it did not) in writing (which it did not), it thereafter accepted the benefits of the contract – not only all of BMO's work prior to March 2006, but specifically BMO's work in holding discussions with Cardinal and KCI thereafter at McKinley's direction – and thus is estopped from performing its obligations under the Engagement Letter. *See Grot*, 292 Ill. App. 3d at 93, 684 N.E.2d at 1020.

In sum, none of McKinley's Affirmative Defenses are legally valid, and they do nothing to create any genuine issue of material fact. Summary judgment should be granted in favor of BMO and against McKinley.

## V. CONCLUSION

For the reasons stated herein, summary judgment should be granted in favor of BMO and against McKinley on the Complaint pursuant to Federal Rule of Civil Procedure 56.

        Respectfully Submitted,

        BMO Capital Markets Corp.


        By: /s/      Joseph P. Lombardo
                 One of Its Attorneys

Richard A. Wohlleber
Joseph P. Lombardo
Chapman and Cutler LLP
111 West Monroe Street
Chicago, Illinois 60603
(312) 845-3000

## CERTIFICATE OF SERVICE

Joseph P. Lombardo, an attorney, certifies that BMO Capital Market Corp.'s Memorandum of Law in Support of its Motion for Summary Judgment was filed electronically on July 20, 2007. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system. Parties and interested persons may access this filing through the Court's system:

>Daniel J. Mohan
>Daley & Mohan
>150 N. Wacker Drive, Suite 1550
>Chicago, IL  60606
>mohan@daleymohan.com

/s/        Joseph P. Lombardo_____
Joseph P. Lombardo