

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| BMO CAPITAL MARKETS CORP., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.  06 C 6071 |
| | ) | |
| McKINLEY MEDICAL LLC, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

SAMUEL DER-YEGHIAYAN, District Judge

This matter is before the court on Plaintiff BMO Capital Markets Corp.'s ("BMO") motion for summary judgment. For the reasons stated below, we grant the motion for summary judgment.

## BACKGROUND

BMO alleges that in August 2005, Defendant McKinley Medical LLC ("McKinley") hired BMO to be the exclusive financial advisor for McKinley and its affiliate companies in matters concerning sales or mergers. According to BMO, the advisor contract with McKinley was memorialized in an engagement letter ("Engagement Letter"). BMO states that the Engagement Letter included a section

1

that provided that BMO would receive a "Success Fee" if the merger or sale transaction were to involve certain entities such as Moog, Inc. ("Moog"). (Compl. Par. 21). BMO alleges that if Moog was involved in the merger or sale, the Engagement Letter provided that the "Success Fee shall not be less than $650,000." (Compl. Par. 21). BMO claims that it provided McKinley with financial advice and that McKinley ultimately closed a sale with Moog ("Moog Transaction").

BMO alleges that McKinley paid BMO the base fee of $25,000 owed in accordance with the Engagement Letter, but that McKinley refused to pay BMO a $625,000 success fee after subtracting the $25,000 base fee. BMO brought the instant action and includes in the complaint a breach of contract claim.

McKinley filed an answer to the complaint, which includes a counterclaim. McKinley alleges that BMO breached its obligations under the Engagement Letter by failing to identify a buyer that was interested in purchasing McKinley's assets and by being "negligent and ineffectual in consummating the sale of all of McKinley's business to Moog." (CC Par. 11). BMO also allegedly refused to properly help McKinley locate a buyer because it "would require more effort than BMO was willing to expend." (CC Par. 14). McKinley states that, due to BMO's alleged lack of diligence in finding a buyer, McKinley terminated the Engagement Letter and was forced to search for a buyer on its own and complete the merger with Moog. BMO moved to dismiss the counterclaim and we granted BMO's motion to dismiss the negligence counterclaim and denied the motion to dismiss the breach of

2

contract counterclaim. BMO now moves for summary judgment on all claims.

## LEGAL STANDARD

Summary judgment is appropriate when the record, viewed in the light most favorable to the non-moving party, reveals that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In seeking a grant of summary judgment, the moving party must identify "those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)(quoting Fed. R. Civ. P. 56(c)). This initial burden may be satisfied by presenting specific evidence on a particular issue or by pointing out "an absence of evidence to support the non-moving party's case." *Id.* at 325. Once the movant has met this burden, the non-moving party cannot simply rest on the allegations in the pleadings, but, "by affidavits or as otherwise provided for in [Rule 56], must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). A "genuine issue" in the context of a motion for summary judgment is not simply a "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, a genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Insolia v. Philip Morris, Inc.*, 216 F.3d 596, 599 (7th Cir. 2000). The court must consider the record as a whole, in a light most favorable to the non-moving party, and draw all reasonable inferences that favor the non-moving party. *Anderson*, 477 U.S. at 255; *Bay v. Cassens Transport Co.*, 212 F.3d 969, 972 (7th Cir. 2000).

## DISCUSSION

BMO argues that it was hired as the exclusive consultant in regards to mergers and sales such as the Moog Transaction. BMO further argues that since the agreement formed in the Engagement Letter was not terminated, BMO is entitled to be properly compensated for the culmination of any such transaction in accordance with the terms of the Engagement Letter. McKinley, on the other hand, claims that, despite its requests, BMO refused to try and sell parts of McKinley rather than the whole, which was why BMO was unsuccessful in its attempts to locate a buyer. McKinley contends that due to BMO's lack of effort and refusal to attempt to sell parts of McKinley, McKinley terminated the Engagement Letter and was forced to independently pursue buyers. McKinley contends that it ultimately made a deal with Moog for part of McKinley's assets, without any assistance by BMO and that BMO is thus not entitled to the fee now sought. BMO responds that it dutifully made all reasonable efforts to locate buyers even while McKinley was negotiating with Moog, and that McKinley's decision to pursue Moog on its own does not absolve BMO of

its entitlement to a proper fee as provided in the Engagement Letter.

## I. Success Fee For Culmination of Possible Transaction

McKinley argues that the terms in the Engagement Letter are ambiguous, which precludes the court from granting BMO's motion for summary judgment. It is undisputed that McKinley hired BMO as its investment advisor and the relationship was memorialized in the Engagement Letter. (R SF Par. 10). The terms of the Engagement Letter are also undisputed. The Engagement Letter provided that BMO was to be appointed "to act as exclusive financial advisor to [McKinley] *and its affiliates* in connection with any *Possible Transaction.*" (R SF Par. 13)(emphasis added). The Engagement Letter also provided that BMO would receive the Success Fee for "any Possible Transaction that is consummated," and that the fee would not be less than $650,000 if the Possible Transaction involved certain parties, such as Moog. (B Ex. 25 Par. 4). The Engagement Letter further defined the phrase "Possible Transaction" as "a possible sale of all or a *substantial* portion of the stock or assets of [McKinley], a joint venture with and/or a merger, consolidation, recapitalization, exchange or other business combination involving [McKinley] *or one or more of its affiliates.*" (R SF Par. 13)(emphasis added). McKinley argues that we cannot find as a matter of law that it owed BMO the $650,000 Success Fee because the words "affiliates" and "substantial" in the Engagement Letter are ambiguous.

Contract interpretation is "particularly suited for disposition on summary judgment." *Metalex Corp. v. Uniden Corp. of Am.,* 863 F.2d 1331, 1333 (7th Cir. 1988). The first step in interpreting any contract is determining whether the contract is ambiguous. *Id.* Whether or not an ambiguity exists in a contract is a question of law for the court to determine. *Vill. of Glenview v. Northfield Woods Water & Utility Co., Inc.,* 576 N.E.2d 238, 244 (Ill. App. Ct. 1991). When determining whether a contract is ambiguous, the terms of the contract should be given their natural and ordinary meaning. *Dribeck Importers, Inc. v. G. Heileman Brewing Co. Inc.,* 883 F.2d 569, 573-74 (7th Cir. 1989). A contract is intrinsically ambiguous, or internally unclear, when it is "reasonably and fairly susceptible to more than one meaning." *The Home Ins. Co. v. Chicago and Northwestern Transp. Co.,* 56 F.3d 763, 768 (7th Cir. 1995)(quoting *Lenzi v. Morkin,* 452 N.E.2d 667, 669 (Ill. App. Ct. 1983)). A contract can also be extrinsically ambiguous if it is clear on its face but, when understood in the real-world context, anyone "would know that the contract means something other that what it seems to mean." *Id.*

## A. "Affiliates"

McKinley contends that, although the Engagement Letter indicates that BMO would be compensated for sales involving McKinley's "affiliates," it is not clear to which entities the letter referred. However, McKinley must do more than simply argue in the abstract that the term is ambiguous. *See Home Ins. Co.,* 56 F.3d at 768

(stating that language in a contract is not deemed ambiguous simply because the parties disagree as to its meaning). McKinley must show why there are other alternative meanings that are reasonable, which would preclude BMO from prevailing. Instead, McKinley offers academic discourse on the word "affiliate," pointing to a variety of definitions found by McKinley in a dictionary and cases. (Ans. 6).

In light of the context of the Engagement Letter addressing the role of BMO in pursuing buyers for McKinley, and its other terms, it is clear what is referred to by the word "affiliate." Also, even if we were to consider extrinsic facts, McKinley concedes that even before the formulation of the Engagement Letter, Moog was negotiating with McKinley regarding purchasing some of McKinley's product lines that involved some of McKinley's subsidiaries. (R SF Par. 7-8). It is also undisputed that McKinley retained BMO with the Engagement Letter "to create an auction process in furtherance of McKinley's decision to sell its products." (R SF Par. 9). Nothing precluded BMO and McKinley from including general references to groups or types of entities such as affiliates in the Engagement Letter. The term "affiliates" is not ambiguous simply because the parties did not specifically identify every entity that qualified as an affiliate of McKinley. *Chillmark Partners, LLC v. MTS, Inc.*, 2003 WL 1964408, at *3 (N.D. Ill. 2003)(holding that the term "affiliate" was not ambiguous and indicating that the parties did not have to identify every affiliate). The parties also anticipated a possible sale between McKinley or one of

its affiliates by including a specific success fee in the Engagement Letter of "not less than $650,000" for a transaction involving Moog. (R SF Par. 15). It was thus clear what the parties intended by the word "affiliates."

### B. "Substantial"

McKinley argues that the term "substantial," when used in the Engagement Letter to refer to "a possible sale of all or a *substantial* portion of the stock or assets of" McKinley or its affiliates is ambiguous. (R SF Par. 13)(emphasis added). To show ambiguity, McKinley again turns to the dictionary and cases to show that the word "substantial" is not defined with exactly the same words in each definition. (Ans. 7). McKinley cites *William Blair and Co., LLC v. FI Liquidation Corp.*, 830 N.E.2d 760, 773 (Ill. App. Ct. 2005) for the proposition that the term "substantial" is imprecise. (Ans. 7). However, in *William* the contract language at issue did not include the term "substantial." 830 N.E.2d at 770. Rather, the court was evaluating the phrase "substantive discussions." *Id.* During the court's evaluation of the word "substantive," the court did compare it to the word "substantial." *Id.* at 774-775. However, the contract at issue did not contain the word "substantial" and the court did not decide whether the word "substantial" would have been ambiguous in the contract at issue. *Id.*

In the instant action, the parties were the masters of their own agreement. They were not required to specify a precise amount of stock or assets that needed to

be transferred. Clearly, the parties wanted to be guided by a general standard to allow for a certain amount of leeway, which does not itself mean that the term "substantial" is ambiguous. We also note that McKinley noticeably fails to address why the word "substantial" is ambiguous in the context of the Moog Transaction. Thus, we conclude as a matter of law that the term "substantial" is not ambiguous

### C. Moog Transaction

The undisputed facts also clearly indicate that the Moog Transaction constituted a Possible Transaction under the above mentioned provision of the Engagement Letter. Although McKinley argues extensively that the term "affiliates" is vague, McKinley admits, pursuant to Local Rule 56.1 that the Moog Transaction involved the transfer of lines from either one of McKinley's affiliates or from McKinley itself. (R SF Par. 50). For example, BMO asserts in Paragraph 50 of its statement of material facts ("Paragraph 50") that the Moog Transaction involved "one of McKinley's affiliated companies." (SF Par. 50). Although McKinley "denies the allegations of Paragraph 50," McKinley does not cite to any evidence that contradicts the fact that the Moog Transaction involved an affiliate of McKinley and thus the fact is deemed to be undisputed. Local Rule 56.1; *Dent v. Bestfoods*, 2003 WL 22025008, at *1 n.1 (N.D. Ill. 2003)(indicating that a denial is improper if the denial is not accompanied by specific references to admissible evidence, or at least evidence that represents admissible evidence, and that any facts included in a

party's statement of facts that are not properly denied by the opposing party are deemed to be admitted). In addition, although McKinley argues in response to Paragraph 50 that the transaction should not be called a merger, McKinley does not dispute the fact that the Moog Transaction involved an affiliate of McKinley. (R SF Par. 50). We also note that McKinley argues in response to Paragraph 50 that the Moog Transaction actually involved the sale of McKinley itself, which made the transaction a Possible Transaction on that basis alone and renders the definition of "affiliates" irrelevant. (R SF Par. 50).

In regard to the sale of a "substantial portion" of McKinley's stock or assets, even if, as McKinley contends, the sale was between McKinley and Moog, McKinley states that the sale involved approximately 50 percent of McKinley. (R SF Par.). Such a sizable portion of ownership of McKinley clearly would qualify as a "substantial portion." Thus, the Moog Transaction clearly fell within the scope of a Possible Transaction referred to in the Engagement Letter.


### D. Procuring Contract

McKinley also argues that, under the terms of the Engagement Letter, it is not obligated to pay the success fee to BMO because the Engagement Letter was a procuring contract and BMO was only entitled to get paid the success fee if BMO itself procured a buyer for McKinley. McKinley does not point to any provision in the Engagement Letter providing that BMO is only to receive the success fee if

BMO itself procures the buyer. McKinley's argument is contrary to the explicit text of the Engagement Letter, which provides that BMO is to receive the Success Fee when any Possible Transaction involving McKinley or its affiliate is "consummated." (B Ex. 25 Par. 4). Thus, McKinley's contention that BMO needed to procure Moog in order to get the Success Fee for the Moog transaction is contrary to the express terms of the Engagement Letter and entirely without any merit. Thus, based upon the above mentioned undisputed evidence, the Moog Transaction qualified as a Possible Transaction that triggered McKinley's obligation to pay BMO the $650,000 Success Fee in accordance with the terms of the Engagement Letter.

## II. BMO's Alleged Failure to Honor its Obligations

McKinley contends that under the terms of the Engagement Letter, BMO was obligated to act as McKinley's exclusive advisor to locate potential buyers. McKinley argues that BMO refused to sell McKinley in parts instead of in whole and that the refusal prevented BMO from obtaining a buyer. McKinley claims that, by refusing to make the effort to sell McKinley in parts, BMO breached its obligation to use its best efforts to locate buyers.

### A. Efforts Made by BMO to Obtain Buyers

McKinley contends on one hand that BMO failed to make its best effort to locate potential buyers for McKinley.

### 1. Discovery of Potential Purchasers by McKinley

McKinley complains that it had to identify potential buyers for BMO, despite the fact that BMO was retained to perform that task. (SAF Par. 18). However, the only support McKinley provides for that statement is a citation to pages 63 and 64 of David Maytubby's ("Maytubby") deposition transcript. During that portion of Maytubby's deposition, he indicated that McKinley provided BMO with additional names to "add on to the buyer's sheet." (May. Dep. 63-64). Nowhere, however, in the testimony did Maytubby indicate that McKinley itself was forced to look for those additional potential buyers because BMO was not doing its job. The mere fact that McKinley discovered additional potential purchasers and forwarded the information to BMO does not mean that BMO was not meeting its contractual obligation to locate potential buyers. In fact, it is only logical that McKinley, which is operating a business in a certain market, would likely come across potential buyers in that market on its own. Thus, McKinley's statement that "[t]hroughout its relationship with BMO, McKinley repeatedly had to identify potential buyers despite its retention of BMO to do exactly this," is an unsupported accusation by McKinley, which is insufficient to carry the day at the summary judgment stage. McKinley cites no evidence that shows it in fact "had" to locate potential buyers in order to complete a sale.

### 2. Significant Efforts Made by BMO

12

McKinley also acknowledges that BMO made significant efforts to locate buyers for McKinley. It is undisputed that BMO put together an "Acquisition Opportunity" marketing sheet. (R SF Par. 21). It is also undisputed that BMO put together a "Confidential Information Memorandum," ("CIM") and an accompanying letter which could be provided to potential buyers. (R SF Par. 22, 27). McKinley acknowledges that BMO contacted potential buyers and that "[w]hile the sales process was ongoing, McKinley's focus was on getting as many bids as possible." (R SF par. 33). McKinley also admits that although BMO was unable to close a deal with Moog, BMO contacted Moog and discussed a possible purchase. (R SF Par. 34). McKinley also admits that BMO engaged in discussions with Cardinal Healthcare ("Cardinal") and Kinetic Concepts, Inc. ("KCI") regarding a possible purchase of McKinley. (R SF Par. 37, 40). Thus, the undisputed evidence shows that BMO did make substantial efforts to secure a buyer for McKinley.

### B. Alleged Refusal to Sell Parts of McKinley

McKinley contends that BMO could have found a buyer if BMO would have agreed to try and find buyers for parts of McKinley as opposed to buyers that were only interested in purchasing McKinley as a whole. BMO, however, denies that it ever refused to try and sell parts of McKinley. BMO asserts in paragraph 25 of its statement of material facts ("Paragraph 25") that "BMO drafted the CIM to present the McKinley product lines individually in order to elicit interest in those product

lines individually." (SF Par. 25). McKinley disputes Paragraph 25, contending that "BMO specifically and consistently refused on more than one occasion to sell McKinley product lines individually. . . . " (R SF Par. 25). This contention that BMO refused to sell McKinley in parts is the crux of McKinley's belief that BMO did not honor its obligations under the Engagement Letter and is the crux of McKinley's breach of contract counterclaim. (Ans. 13). In support of this key issue, which is presented in Paragraph 25, McKinley cites the deposition transcripts of Maytubby, Michael Pincus ("Pincus"), Thomas Gerlacher ("Gerlacher"), and Thomas Midura ("Midura"). (R SF Par. 25). McKinley also states in its statement of additional material facts that "Gerlacher of BMO specifically refused to participate in finding purchasers for the parts of McKinley's business," and in support McKinley cites the same depositions. (SAF Par. 23). As shown below, all of these citations actually support BMO's version of the facts rather than McKinley's version of the facts and thus the facts in Paragraph 25 are not properly disputed under Local Rule 56.1. *Dent v. Bestfoods*, 2003 WL 22025008, at *1 n.1 (N.D. Ill. 2003)(indicating that a denial is improper if the denial is not accompanied by specific references to admissible evidence, or at least evidence that represents admissible evidence, and that any facts included in a party's statement of facts that are not properly denied by the opposing party are deemed to be admitted); *Jankovich v. Exelon Corp.*, 2003 WL 260714, at *5 (N.D. Ill. 2003)(indicating that evasive denials that do not directly oppose an assertion are improper and thus the

14

contested fact is deemed to be admitted pursuant to Local Rule 56.1).

### 1. Maytubby Deposition

McKinley cites pages 116, 117, and 148 of the transcript of the deposition of Maytubby, who worked for McKinley. (May. Dep. 9-10); (R SF Par. 25). During that portion of Maytubby's deposition, he indicated that in February of 2006 he discussed with BMO representatives the possibility of locating a buyers for parts of McKinley. (May Dep. 116-17). Maytubby testified that the BMO representatives believed that "selling the company in pieces strategy would be too hard, too difficult, [and] disruptive of management." (May Dep. 116). Maytubby stated that the BMO representatives "advised us not to do that." (May Dep. 116). Later in Maytubby's deposition, he again referred to the fact that BMO advised McKinley not to try to sell itself in parts. (May Dep. 148). Nowhere in the portion of Maytubby's deposition cited by McKinley does he state that BMO refused to try and locate buyers for parts of McKinley. Neither is the court obligated to sift through the entire transcript and exhibits for Maytubby's deposition to make McKinley's case for it. *See Hicks v. Midwest Transit, Inc.*, 2007 WL 2580430, at *6 (7th Cir. 2007)(stating that the non-moving party "had 'the burden to point to . . . information to show that a genuine issue of fact exist[s]; the district court 'need not scour the record' to find such evidence'")(quoting in part *RuffinThompkins v. Experian Info. Solutions, Inc.*, 422 F.3d 603, 607 (7th Cir. 2005)). The statement by Maytubby that BMO

15

"advised" McKinley not to choose that option clearly shows that BMO was merely offering advice, which it was retained to do, and nothing in Maytubby's deposition testimony indicates that BMO refused or would have refused a demand by McKinley that BMO try and locate buyers for parts of McKinley.

### 2. Pincus Deposition

McKinley cites pages 49 and 50 of the transcript of the deposition of Pincus. (R SF Par. 25). In the portion of Pincus' deposition testimony cited by McKinley, Pincus likewise stated that BMO representatives merely advised McKinley not to try and sell itself in parts. (Pin. Dep. 49). Pincus testified that BMO thought it a bad idea to try and sell McKinley in pieces since there were not even parties interested in the whole company. (Pin. Dep. 50). Nowhere in the testimony cited by McKinley did Pincus indicate that BMO refused to try and locate buyers for parts of McKinley. In fact, Pincus made it clear that the advice by BMO not to sell parts of McKinley was something that McKinley "had to think about. . . [and] had to evaluate it." (Pin. Dep. 50). Thus, Pincus indicated that BMO's question to McKinley was essentially "what do you want to do?," and BMO awaited McKinley's ultimate decision as to whether McKinley would in fact desire to sell itself in parts. (Pin. Dep. 50). Pincus also indicated that no BMO representative ever "express[ed] a disinterest in selling McKinley in parts." (Pin. Dep. 50). Thus, McKinley's citation to Pincus' deposition does not support McKinley's statement

16

that BMO refused to try and locate buyers for parts of McKinley.

### 3. Gerlacher Deposition

McKinley cites page 83 of the transcript of the deposition of Gerlacher's deposition transcript. (R SF Par. 25). In the portion of the deposition cited by McKinley, Gerlacher indicated that BMO, "advis[ed] against" trying to sell McKinley in parts. (Ger. Dep. 83). Gerlacher was twice asked whether "anyone" at BMO "at any time" indicated that "BMO was not interested in getting involved in multiple transactions for selling parts of McKinley," and Gerlacher responded "No" both times. (Ger. Dep. 83-84). Gerlacher also explained that they advised McKinley against trying to sell itself in parts due to feedback that BMO had received from bidders. (Ger. Dep. 81). Gerlacher stated that BMO was merely giving advice and that McKinley did not at that time make "a decision one way or another. . . ." (Ger. Dep. 81). Thus, Gerlacher's deposition testimony does not support McKinley's assertion that BMO refused to sell McKinley in parts.

### 4. Midura Deposition

McKinley cites pages 53 and 54 of the transcript of the deposition of Midura. (R SF Par. 25). Midura indicated that BMO advised McKinley not to try and sell itself in pieces based upon the fact that BMO had already presented numerous buyers with information concerning McKinley and received no offers for the whole

17

or parts of McKinley. (Mid. Dep. 53). Midura indicated that Maytubby never asked BMO to sell pieces of McKinley. (Mid. Dep. 54). When Midura was asked at his deposition whether "BMO was interest in selling the pieces of McKinley," Midura responded that BMO "was interested in helping [its] client," and that BMO "had effectively been trying to do that as well as sell the whole company." (Mid. Dep. 54). Thus, Midura's deposition testimony does not support McKinley's assertion that BMO refused to sell McKinley in parts.

### 5. Summation of Support Provided by McKinley

The evidence cited by McKinley shows that BMO never refused to sell McKinley in parts and, in fact, McKinley asked for BMO's advice, but McKinley never actually asked BMO to sell parts of McKinley. BMO thus merely offered advice on the issue, which was what BMO was hired to do under the Engagement Letter. Thus, since McKinley has not offered any citation to support its denial of the facts in Paragraphs 25, the facts are deemed undisputed pursuant to Local Rule 56.1. It is thus clear that BMO did not refuse to sell McKinley in parts and that BMO did not breach its obligations under the Engagement Letter in this regard. McKinley has been given the opportunity to conduct discovery and collect evidence to support its position and at the summary judgment stage it must present evidence to support its case. McKinley is not entitled to proceed to trial and ask the trier of fact to speculate that BMO refused to sell McKinley in parts in the absence of evidence in

support, especially in light of the evidence referenced above that supports BMO's position. Also, to the extent that McKinley is now arguing that it anticipated that BMO was going to refuse to sell McKinley in parts, if asked, McKinley has not pointed to sufficient evidence to support that theory either. Therefore, McKinley cannot avoid its contractual obligation to BMO under the Engagement Letter by claiming that BMO failed to make reasonable efforts to locate buyers and failed to honor its obligations under the agreement. If McKinley decided to on its own pursue Moog to sell parts of McKinley, nothing precluded McKinley from taking that step. However, McKinley should have understood that since it had not told BMO to try and sell parts of McKinley to Moog and BMO never refused to do so, McKinley was not relieved from its obligation under the Engagement Letter to compensate BMO.

III.  Whether McKinley Terminated or Modified the Engagement Letter

McKinley also argues that it is not obligated to pay BMO for the Moog Transaction because, before the culmination of the Moog Transaction, Maytubby terminated or modified the Engagement Letter. (SAF Par. 30).

A.  Termination

McKinley contends that Maytubby terminated the Engagement Letter during a conference call with Pincus and Gerlacher on March 21, 2006 ("Conference Call") and that Maytubby subsequently sent written notification to BMO. (SAF Par. 30-

31).

### 1. Conference Call

McKinley admits that Maytubby told BMO during the Conference Call not to "further market McKinley." (R SF Par. 41). McKinley also admits that the "request was made orally, and not in writing." (R SF Par. 41). McKinley also admits, that the Engagement Letter provided that it could be terminated "upon written notice to the other party. . . ." (R SF Par. 18). Thus, by the terms of the Engagement Letter itself, Maytubby's oral request could not have had the legal effect of terminating the Engagement Letter. Thus, the undisputed facts show that McKinley's statement that Maytubby terminated the Engagement Letter at the Conference Call is inaccurate.

### 2. Written Notice

McKinley also contends that after the Conference Call, Maytubby sent written notice of the termination of the Engagement Letter to BMO. However, as before, a careful review of the evidence cited by McKinley in support of its position reveals an absence of evidence to support its case. McKinley cites page 96 of Maytubby's deposition transcript and Exhibit 8 of Pincus' deposition in support of McKinley's contention that it sent written notice of the termination of the Engagement Letter to BMO. (SAF Par. 31). In the portion of Maytubby's deposition cited by McKinley, Maytubby merely indicates that during the Conference Call he orally told BMO to

stop trying to sell McKinley. (May Dep. 96). Nowhere in the portion of Maytubby's deposition cited by McKinley does Maytubby mention any written document sent to BMO or any written notice terminating the Engagement Letter. In regard to Exhibit 8 of Pincus' deposition, the exhibit includes text of an email sent by Pincus to Maytubby after the Conference Call. McKinley's initial mistake in relying on this document is that it is text from an email that was sent from BMO to McKinley and thus on its face could not constitute written notice sent from McKinley to BMO. In addition, in the email Pincus merely informs Maytubby that BMO received a call from KCl and Pincus wanted to know whether McKinley wanted BMO to pursue the matter. (Pin. Dep. Ex. 8). Pincus begins his question in the email by stating "[n]otwithstanding our recent conversation," making reference to the Conference Call, in which Maytubby told BMO to stop looking for buyers. (Pin. Dep. Ex. 8). Pincus makes no reference to any written notification of the termination of the Engagement Letter. Nor does Pincus make any reference at all to the termination of the Engagement Letter. The fact that Pincus in his email to Maytubby was inquiring if it should re-start its efforts to locate a buyer for McKinley, actually indicates that the BMO did not understand that the Engagement Letter was terminated.

Maytubby also indicated at his deposition that McKinley had satisfied the "written notice" requirement in the Engagement Letter for termination. (B Ex. 25 Par. 7)(May Dep. 152). However, Maytubby made clear at his deposition that the

basis for his conclusion was his belief that the requirement was satisfied by the email that was sent to him by Pincus. (May Dep. 151-52). At no point in the portion of Maytubby's deposition cited by McKinley did Maytubby explicitly state that he sent a written notice of termination to BMO. Thus, McKinley's statement that it sent written notice of the termination of the Engagement Letter to BMO, is nothing more than an unsupported allegation, which cannot defeat BMO's motion for summary judgment.

### B. Modification

McKinley also contends that during the Conference Call, the parties modified the Engagement Letter. (Ans. 11). Under the alleged new terms, the Engagement Letter was to terminate if BMO was unable to conclude a deal with either Cardinal or KCI. (Ans. 11).

### 1. Written Modification

Under the express terms of the Engagement Letter, any modification of the agreement, needed to be agreed to by the parties in writing. (B Ex. 25 Par. 10). McKinley does not point to any such writing memorializing a modification. McKinley does argue that BMO waived its right to enforce the provision in the Engagement Letter requiring modifications to be in writing. (Ans. 12). However, McKinley did not list waiver as an affirmative defense in its answer to the complaint

in this case. (Answer to Compl. 11). Waiver is an affirmative defense. *See, e.g., Old Republic Ins. Co. v. Ness, Motley, Loadholt, Richardson & Poole, P.A.*, 2006 WL 88666, at \*9 (N.D. Ill. 2006); *Microthin.com, Inc. v. Siliconezone USA, LLC*, 2006 WL 3302825, at \*10 (N.D. Ill. 2006). Pursuant to Federal Rule of Civil Procedure 8(c), a defendant is required to assert affirmative defenses in the answer to the complaint. Fed. R. Civ. P. 8(c). An affirmative defense not disclosed in accordance with Rule 8(c) is waived if "the plaintiff was harmed as a result." *Curtis v. Timberlake*, 436 F.3d 709, 711 (7th Cir. 2005). In the instant action, McKinley in response to the complaint listed four affirmative defenses and counterclaims detailing its position in this case, but did not include a waiver defense in the answer. Discovery has long been closed in this case, and it would be extremely prejudicial to BMO if McKinley were allowed to spring the affirmative defense of waiver on BMO at this point. Thus, McKinley had waived the affirmative defense of waiver. We also note that a review of the undisputed evidence shows that the waiver defense clearly lacks any merit.

### 2. Oral Modification

McKinley also argues that, despite the provision in the Engagement Letter requiring a written modification, the parties agreed orally to modify the Engagement Letter. Under Illinois law, the "parties to a written contract may alter or modify its terms by a subsequent oral agreement . . . ." *South Shore Amusements, Inc. v.*

23

*Supersport Auto Racing Ass'n*, 483 N.E.2d 337, 340 (Ill. App. Ct. 1985)(stating that "[w]hether an oral contract exists, its terms and conditions and the intent of the parties, are questions of fact to be determined by the trier of fact"); *A.W. Wendell and Sons, Inc. v. Qazi*, 626 N.E.2d 280, 287 (Ill. App. Ct. 1993)(stating that "parties to a written contract may alter or modify its terms by a subsequent oral agreement, even though the terms of the contract preclude oral modification").

McKinley makes broad statements regarding a modification, which on their face appear to raise factual issues that cannot be resolved at this stage of the proceedings. However, as with other issues addressed above, a review of the evidence pointed to in support of McKinley's accusations shows that McKinley lacks support for its statements. In support of its contention that the parties agreed to modify the terms of the Engagement Letter, McKinley cites paragraphs 23 ("Paragraph 23"), 30 ("Paragraph 30"), 31 ("Paragraph 31"), and 32 ("Paragraph 32") of its statement of additional material facts. (Ans. 11-12). Paragraph 23 does not contain any facts that refer to a possible modification of the Engagement Letter. Nor does Paragraph 30. Paragraph 30 actually states that the Engagement Letter was terminated as opposed to modified. (SAF Par. 30). Paragraph 31 merely indicates that McKinley provided written notice of the termination of the Engagement Letter. (SAF Par. 31). The allegation in Paragraph 31 that the Engagement Letter was terminated is inconsistent with McKinley's assertion that the Engagement Letter was modified.

24

2005)(citing *Schwinder v. Austin Bank of Chicago*, 809 N.E.2d 180 (2004)). The evidence that McKinley points to in response to BMO's motion for summary judgment falls far short of the evidence necessary for a reasonable trier of fact to conclude that all of the conditions for a modification of the Engagement Letter were met. Thus, McKinley has not pointed to sufficient evidence that shows that the parties agreed to modify the terms of the Engagement Letter. Thus, the undisputed evidence shows that the Engagement Letter was neither terminated or modified, and McKinley was not relieved of its obligations under the Engagement Letter. Based on all of the above, the undisputed evidence clearly shows that BMO is entitled to the $650,000 Success Fee for the Moog Transaction. Therefore, based upon the above, we grant BMO's motion for summary judgment on the claims in the complaint.

## IV. Counterclaim

BMO indicates that it is seeking summary judgment on the remaining counterclaim as well as on the claims included in the complaint. (SJ Mem. 1). As indicated above, the remaining breach of contract counterclaim brought by McKinley is based upon allegations that BMO breached its obligation under the Engagement Letter to use its best efforts to locate potential buyers. (Answer to Compl. Par. 11-14). As discussed above, the undisputed evidence shows that BMO did not breach its obligation to use its best efforts to locate potential buyers for

26

In Paragraph 32, McKinley contends that Maytubby agreed to pay BMO under the terms of the Engagement Letter if BMO concluded a deal with either Cardinal or KCI. (SAF Par. 32). During the portions of Maytubby's deposition cited by McKinley, Maytubby discussed Pincus' email requesting permission to pursue a lead with KCI, and Maytubby actually indicated that he intended to terminate the Engagement Letter, which is inconsistent with McKinley's contention that the parties intended to modify the Engagement Letter. (May Dep. 101-102, 151). Maytubby does not provide any basis in his deposition to reasonably conclude that BMO agreed to a modification under which the Engagement Letter would automatically be terminated if BMO did not secure a deal with KCI or Cardinal. Maytubby was in fact specifically asked, in regard to BMO's continued efforts to contract Cardinal and KCI, "So did you modify the arrangement with BMO so they did something different for you?," and Maytubby responded: "No." (May. Dep, 112). Even if McKinley could show that Maytubby thought the parties agreement to modify the engagement letter, Maytubby's self-serving belief that the Engagement Letter was modified is not sufficient to show a modification. *See Wilson v. Electro Marine Systems, Inc.*, 915 F.2d 1110, 1119 (7th Cir. 1990)(indicating that one party's "unilateral beliefs cannot bind" the other party to an agreement).

Also, Under Illinois law, in order to modify an enforceable agreement there must be an "offer, acceptance, and consideration" as with the original contract. *Van Der Molen v. Washington Mut. Finance, Inc.*, 835 N.E.2d 61, 69 (Ill. App. Ct.

25

McKinley. The undisputed evidence clearly shows that BMO made reasonable efforts to locate buyers and did not refuse to seek buyers interested in purchasing parts of McKinley. There has been no evidence presented that would indicate that McKinley's unilateral decision to pursue a deal with Moog extinguished any contractual obligation that it owed to BMO under the contract. Therefore, we grant BMO's motion for summary judgment on the counterclaim as well.

## CONCLUSION

Based on the foregoing analysis, we grant BMO's motion for summary judgment in its entirety.

Samuel Der-Yeghiayan
United States District Court Judge

Dated: September 18, 2007